UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WENDY TABENSKE,

              Plaintiff,

                                     Case No. 07-CV-12594

vs.

                                     HON. GEORGE CARAM STEEH

NSO, INC. d/b/a HARTE-HANKS
TECHNOLOGY MARKETS ORGANIZATION,

              Defendant.
_____/

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. 15]

      This case arises out of plaintiff Wendy Tabenske's complaint against her

employer, defendant Harte-Hanks, alleging that her termination amounted to

discrimination on the basis of her gender in violation of Title VII of the federal Civil

Rights Act and Michigan law; violated her rights under the Americans with Disabilities

Act; and was in retaliation for taking an approved FMLA leave in violation of that act.

Plaintiff has conceded her claims for FMLA retaliation and disability discrimination, and

the Court finds there are issues of material fact with regard to her gender discrimination

claims.  Defendant's motion for summary judgment is therefore GRANTED in part and

DENIED in part.

FACTUAL BACKGROUND

      Plaintiff began her employment with defendant's predecessor, IRG, in 1997 as a

regional sales representative.  She was promoted twice into management positions.  In

October 2001, IRG was bought out by defendant, and plaintiff went back into individual

sales.  Defendant moved her into sales management after she closed a $3 million deal.
In 2004, plaintiff requested to return to direct sales to earn more money.

Plaintiff reported to Brad Wamsley in 2005.  On April 29, 2005, Wamsley
prepared an "Interim Performance Assessment" which praised plaintiff as a talented
employee with a proven track record.  The memo then criticized plaintiff's performance,
pointing to three areas that needed improvement: face-to-face calls, new opportunities,
and dollar value of opportunities.  The memo called on plaintiff to make at least 7 face-
to-face calls by May 30, and submit call reports; increase the number of opportunities in
her funnel to 6 by May 30, measured by the end of May funnel report; and increase the
dollar value of opportunities in her funnel to $2 million-plus, measured by the end of
May funnel report.

In July 2005, plaintiff told Wamsley that she was pregnant.  According to plaintiff,
Wamsley said she "should stay home and take care of (her) children because (she has)
a husband who has a good job and who is working" and "should be taking care of" her.
(Tabenske dep. p. 116).  When plaintiff returned from her maternity leave in January
2006, she contends she was confronted by managing director Kevin Kerner, who said
"I'm concerned you're not here, you've changed since you had a child and what are you
going to do?"  (Tabenske dep. p. 125-26).  Plaintiff assured Kerner she was engaged in
her job, and the topic was not raised with plaintiff again.

In August 2006, defendant hired John Carpenter to create and run a "TMO
Specialist Organization."  Carpenter lead a team of four Data Solutions VPs, including
plaintiff, to grow defendant's TMO HMI business.  An e-mail announcing the formation
of the new group described plaintiff as having "great success in licencing data and [she]

2

2:07-cv-12594-GCS-RSW   Doc # 22   Filed 01/06/09   Pg 3 of 13   Pg ID 736

will use her experiences and knowledge of many of these customers and HMI services

to grow revenue across the market she covers.  Wendy will also continue to manage the

data business at Hewlett Packard ("HP,") one of HMI's biggest accounts."  (Plaintiff's

exhibit 8).  Plaintiff went from selling one set of products to three accounts, to selling

only data.

        The data solutions team consisted of plaintiff and Julie Donovan, both of whom

already worked for defendant.  The team also included Brian Wetterling and Robert

Morris, both of whom Carpenter recruited from his old employer, Dunn and Bradstreet.

The salaries of the team members were as follows: Robert Morris ($127,000 a year),

Brian Wetterling ($117,000 a year), Julie Donovan ($110,000 a year), and plaintiff

($100,000 a year).  In addition to salaries, the team members had the opportunity to

earn substantial bonuses.

        Plaintiff began reporting to Carpenter on October 2, 2006.  She met with him only

two times during her employment - once on a sales call and once at the National Sales

meeting.  In October 2006, plaintiff obtained a 5-year agreement from HP for

$9,750,000.  Carpenter wrote an e-mail congratulating plaintiff:

> You and the team have successfully moved HP off an extension situation
> that left us hanging virtually month to month and locked up the revenue for
> some time to come!  So the first good thing is you have locked up revenue
> for yourself and for HH (Harte Hanks) - thank you.  That is commitment.

(Plaintiff's ex. 1).

        On October 25, 2006, Carpenter sent an e-mail to Craig Heile, a new

salesperson, identifying plaintiff as one of the three specialists that drive business for

defendant.  (Plaintiff's ex. 3).  On December 18, 2006, Carpenter praised plaintiff's "winback strategy plan" for Xerox.  (Plaintiff's ex. 32).

In the beginning of 2007, Carpenter developed target goals for his team. Plaintiff's target was increased from $3.1 million to $3.3 million, while her male co-workers' targets were decreased and they were given accounts that already had revenues.

On January 8, 2007, Carpenter received an e-mail from Andre Fino, a man he supervised in a previous employment, indicating his possible interest in a position for defendant that Carpenter was looking to fill.  (Plaintiff's ex. 13).  Plaintiff speculates that the position Fino was referring to was her position.  On January 22, 2007, Fino wrote to Carpenter to "touch base" and "find out more about that position" that Carpenter was "looking to fill."  (Plaintiff's ex. 17).  On February 8, 2007, Fino sent Carpenter his resume and wrote, "I'm glad that we are proceeding down this path and I look forward to taking the next steps."  (Plaintiff's ex. 18).  On February 9, 2007, Carpenter e-mailed his leader, Kevin Kerner, about Fino's resume:

> This guy could be a new biz guy to combine some HMI accounts with tier 2's we are not getting to now and some accounts that are on Wendy's list (should she end up leaving soon)
> 
> \* \* \*
> 
> Here are some events that we need to manage
> 1.  Wendy not cutting the mustard - her book is HP and a bunch of opportunity.  its not a homogeneous book of business, nor is it geographically
> 
> \* \* \*
> 
> If I can coordinate the accounts coming over, with Wendy leaving and a new hire or hires coming over I can do this right.  Obviously there are lots of moving parts here.

(Plaintiff's ex. 2).

4

On February 15, 2007, Carpenter e-mailed Kerner regarding a discussion with plaintiff:

> After that I asked her if she was happy in your position, that she seemed very down for the last month, was she "ok?" . . . she was silent for about 30 seconds (she is not that quick on her feet) but eventually told me she 'knew what her job was and was doing it to the best of her ability' which was not a direct answer to my question, but it tell me what I need to know. I do not think she will want to opt out, but I am sure she does not have the 'will' to do the job even tho she has the skill.

(Plaintiff's ex. 19).  Two hours later, Carpenter e-mailed Kerner:

> I put this together . . . I pushed the dates out . . . this will also give me time to hire and train the right person for upgrade of Wendy and new specialist - hunter.

(Plaintiff's ex. 20).  Kerner testified that this meant Carpenter was giving him his schedule to hire and replace plaintiff.  (Kerner dep. p. 52).

In late Feburary, Carpenter arranged a phone interview between Fino and Kerner, and notified Human Resources (Kelly Johnston) that he contemplated plaintiff's termination.  (Kerner dep. p. 111, 116).  On March 1, 2007 at 5:40 p.m., Carpenter e-mailed plaintiff a memo titled "Steps to Improve Performance" which demanded several reports by March 5, 2007.  (Plaintiff's ex. 33).

On March 8, 2007, Carpenter e-mailed Fino: "We are fine - lets talk tomorrow". (Plaintiff's ex. 21).  On March 9, 2007, Carpenter prepared an Employee Key Performance and Compensation Plan for plaintiff, but never showed it to her.

On March 14, 2007, Carpenter fired plaintiff during a telephone call.  Plaintiff e-mailed Carpenter summarizing his termination of her employment.  (Plaintiff's ex. 23).

On March 15, 2007, Carpenter e-mailed HR that Fino verbally accepted the job offer for $110,000 base salary and a $12,500 hiring bonus.  (Plaintiff's ex. 24).

5

Carpenter admitted at his deposition that Fino replaced plaintiff by taking over the accounts she handled.  (Carpenter dep. pp. 126-127).  Fino admitted that HP was his largest customer and generates "probably more" than two-thirds of his quota.  (Fino dep. pp. 42-43).

<u>STANDARD FOR SUMMARY JUDGMENT</u>

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  <u>See</u> <u>Redding v. St. Eward</u>, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986); <u>see</u> <u>also</u> <u>Cox v. Kentucky Dept. of Transp.</u>, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" <u>Amway Distributors Benefits Ass'n v. Northfield Ins. Co.</u>, 323 F.3d 386, 390 (6th Cir. 2003) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Redding</u>, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly

6

supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original); <u>see also</u> <u>National Satellite Sports, Inc. v. Eliadis, Inc.</u>, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 270 (1968); <u>see also</u> <u>McLean v. 988011 Ontario, Ltd.</u>, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. <u>Anderson</u>, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. <u>McLean</u>, 224 F.3d at 800 (citing <u>Anderson</u>, 477 U.S. at 252).

<u>ANALYSIS</u>

Plaintiff contends that her discharge was the result of gender discrimination, and brings suit under both Title VII and the Elliot Larsen Civil Rights Act. Michigan courts often turn to federal law when interpreting Michigan's anti-discrimination statutes, so this Court will rely upon Title VII standards for both the federal and state claims. <u>Jackson v. Quanex Corp.</u>, 191 F.3d 647, 658 (6th Cir. 1999); <u>Victorson v. Department of Treasury</u>, 439 Mich. 141, 142-143 (1992).

A plaintiff may establish a prima facie claim of gender discrimination through direct evidence of discrimination, or, in the absence of direct evidence, by making a showing of the following four factors:

7

(1)     she was a member of a protected class;

(2)     she was discharged;

(3)     she was qualified for the position; and

(4)     she was replaced by a person outside the class or was treated worse than
        a similarly situated person outside of the class.

Lautermilch v. Findlay City Schools, 314 F.3d 271, 275 (6th Cir. 2002) (citing

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  If plaintiff establishes a

prima facie case, the burden of production shifts to defendant to articulate a legitimate,

nondiscriminatory reason for plaintiff's discharge.  White v. Columbus Metro. Hous.

Auth., 429 F.3d 232, 238 (6th Cir. 2005).  If defendant is able to articulate such a

reason, the burden shifts back to plaintiff to show that the articulated reason is a pretext

to mask discrimination.  Id.

I.  Prima Facie Case

    A.  Direct Evidence of Discrimination

        Plaintiff claims that after telling Brad Wamsley about her pregnancy in July 2005,

he told her that she should stay home and take care of her children because her

husband has a good job and should take care of her.  Carpenter, the decision-maker in

plaintiff's termination, made his determination in part based on plaintiff's purported "lack

of responsiveness."  When asked why he thought plaintiff was not responsive,

Carpenter said it was based on evaluations from people who worked with plaintiff.

(Carpenter dep. p. 70).  Wamsley's comment was made almost two years prior to

plaintiff's discharge, and was not related to the discharge.  Several inferences need to

be made to connect the alleged comment to the discharge.  When evidence requires

8

multiple inferences, it is not direct evidence of discrimination.  See <u>Acker v. Workhorse Sales Corp.</u>, 2008 U.S. Dist LEXIS 34812, *11 (E.D. Mich. April 28, 2008) (J. Steeh) (unpublished).

Carpenter's boss was Kevin Kerner, and he approved plaintiff's termination. Upon plaintiff's return from maternity leave in January 2006, Kerner wanted to make sure she was still engaged, allegedly saying to her,  "I'm concerned you're not here, you've changed since you had a child and what are you going to do?"  Carpenter discussed with Kerner his plan to remove plaintiff and replace her with Fino, and Kerner agreed with it.  However, Kerner's comment, which is not discriminatory on its face, was isolated and occurred over a year prior to plaintiff's termination.  Statements made by a decision maker unrelated to the employment decision at issue, that is, statements which are isolated, ambiguous, or remote in time relative to the challenged employment decision, do not constitute direct evidence of unlawful discrimination.  <u>Millner v. DTE Energy Co.</u>, 285 F. Supp. 2d 950, 966 (E.D. Mich. 2003) (citing <u>Wells v. New Cherokee Corp.</u>, 58 F.3d 233, 237-38 (6th Cir. 1995).

The Court concludes that plaintiff has failed to make out a claim of discrimination supported by direct evidence.

B.  <u>Indirect Evidence of Discrimination</u>

Plaintiff has established a prima facie case of gender discrimination under the <u>McDonnell Douglas</u> framework.  Plaintiff is female, and therefore a member of a protected class.  She was discharged and was treated worse than and/or was replaced by a male.  Finally, there is sufficient evidence that plaintiff was qualified for her position of selling data.

9

II. Legitimate, Nondiscriminatory Reason

Defendant offers four reasons for terminating plaintiff due to poor job performance: (1) failure to meet sales quotas; (2) failure to comply with performance plans; (3) poor peer evaluations; and (4) loss of accounts.

A. Sales Quotas

Defendant contends that plaintiff finished 2006 approximately 20% below her sales quota. In January 2007, plaintiff was only making 83% of her target sales, even though defendant gave her relief from her quota. Defendant compares plaintiff to Morris and Wetterling, who were exceeding their quotas during this same time period.

The time period involved in this case is quite short. Plaintiff began reporting to Carpenter in her new position on October 2, 2006 and she was terminated on March 14, 2007, so she only worked in this position for five and a half months. Plaintiff admits she did not make quota the first two months of 2007, but she exceeded her quota the third month of 2007. Plaintiff's major point of contention is that Morris and Wetterling brought in less revenue, were given smaller quotas, and were given more relief toward their quotas than she was.

In 2007, plaintiff was given $147,000 in relief for the year, compared with Morris' $929,435 and Wetterling's $1.1 million. For the eight months Fino worked in the same position on plaintiff's accounts, he received $165,785 in relief. In response to the assertion that plaintiff only made 83% of her target sales in January 2007, plaintiff explains that her quota was much higher ($273,091) than her male co-workers (Morris: $116,266 and Wetterling: $148,059). In addition, a sales representative can be below quota one month and make it up the next. (Wetterling dep. at p. 30).

10

Issues of fact remain as to whether plaintiff was treated differently than her male colleagues regarding sales quotas. Specifically, there are factual issues concerning the criteria considered in establishing sales quotas and relief from sales quotas, and how performance was measured for each sales representative.

B. <u>Sales Performance Plans</u>

Each sales representative was required to report their sales activity to Carpenter on a weekly basis. Carpenter was not satisfied with plaintiff's alleged failure to complete her sales activity reports. Plaintiff was given a specific written performance plan on Wednesday, March 1, 2007, which requested three things: (1) a draft of strengths and weaknesses with a strategy of how to leverage her strengths to achieve the sales plan; (2) a sales plan for her territory with details on her activity and how she would achieve her plan each quarter, and (3) a log of daily calls identifying and describing her external and internal calls. These items were to be given to Carpenter on Monday, March 5, 2007.

Plaintiff did not comply with the first requirement. For the second requirement, plaintiff re-sent the sales plans Carpenter had sent to her, without any report or plan of her own. As for the third requirement, plaintiff contends she kept a log of daily calls on her computer, and while Carpenter had access to the log he never looked at it. Plaintiff admits she never affirmatively sent the log to Carpenter, even though she knew he wanted to see it.

Plaintiff points out that by the time Carpenter put her on a performance plan, he had already made the decision to fire her and hire Fino. Plaintiff contends that Morris

11

and Wetterling were given the opportunity to benefit from probation when they had performance problems, but she did not legitimately receive the same opportunity.

While it appears that plaintiff failed to comply with her sales performance plan, there are still issues of fact whether the performance plan was a pretext. In addition, the circumstances surrounding the performance plans Morris and Wetterling may have been on would be relevant to plaintiff's claims of discriminatory treatment.

C. Peer Evaluations

A review of plaintiff's peer evaluations shows that she received many marks of "1" (the lowest score) and "3", out of a possible "5" ranking. Plaintiff's male co-employees were not employed long enough to receive comprehensive evaluation from their peers. There is not enough evidence as to peer evaluations to either support or reject plaintiff's discrimination claim.

D. Loss of Accounts

Plaintiff claims that she was held responsible for losing certain accounts, which were due to reasons out of her control. For example, Xerox cancelled their contract for budgetary reasons. On the other hand, Morris lost Cisco and Oracle, which were part of his 2007 quota, but instead of being disciplined, Morris received relief from his quota. Defendant responds that plaintiff was not terminated for losing accounts. Rather, she was charged with executing a win-back strategy, which she failed to succeed in doing. Issues of fact exist with regard to the loss of accounts or the failure to win back accounts, both by plaintiff and by her male co-workers.

12

III.  Pretext

Plaintiff has succeeded in demonstrating that some of defendant's proffered reasons may not have been the true reason for her termination.  However, plaintiff still carries the ultimate burden of proving that her gender was the determining factor in defendant's decision to terminate her.  A reason given for an adverse employment decision is not a pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993).  There are sufficient issues of fact for the jury to make the ultimate determination of discrimination in this case.

CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted in part and denied in part.  Defendant's motion for summary judgment is granted as to plaintiff's claim of disability discrimination and FMLA retaliation.  Defendant's motion for summary judgment is denied as to plaintiff's claim of gender discrimination under Title VII and ELCRA.

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

Dated:  January 6, 2009

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on January 6, 2009, by electronic and/or ordinary mail.

s/Josephine Chaffee
Secretary/Deputy Clerk

13